IN THE UNITED STATES COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| HAMMERTON, INC., a Utah corporation,<br><br>    Plaintiff,<br><br><br><br>      vs.<br><br><br>ROBERT HEISTERMAN, individually and dba KHAM DESIGN, and KAHM INDUSTRIES, LLC, a Utah limited liability company,<br><br>    Defendants. | MEMORANDUM DECISION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION TO STRIKE AND DIRECTING FURTHER BRIEFING<br><br><br><br><br><br>Case No. 2:06-CV-806 TS |

Before the Court is Defendants' Consolidated Motion to Strike and Exclude, filed in connection with their motions for summary judgment.[1]  Defendants ask the Court to exclude information and witnesses under Federal Rule of Civil Procedure 37(c), including (1) Plaintiff's post-discovery changes to its trade dress claims; (2) Plaintiff's pre-2000 sales and advertising data which was disclosed after the close of discovery; and (3) the Declaration of Michele King, who was not identified as a witness during the discovery period.  Defendants also ask the Court

---

[1]Docket Nos. 100, 102, and 104.

to strike portions of the Declaration of Bill Shott and the Declaration of Levi Wilson for lack of personal knowledge and objectionable hearsay.

After careful consideration of the Parties' memoranda and oral arguments, as well as the record before it, the Court will grant in part and deny in part Defendants' Consolidated Motion as outlined below.

I.  Defendants' Rule 37(c)(1) Objections

As recognized by the Supreme Court, "[t]he pre-trial deposition-discovery mechanism established by Rules 26 to 37 is one of the most significant innovations of the Federal Rules of Civil Procedure."[2]  These procedures are designed to "advance[] the stage at which . . . disclosure can be compelled from the time of trial to the period preceding it, thus reducing the possibility of surprise."[3]  Under the discovery procedures outlined in the Federal Rules, "trials in the federal courts no longer need be carried on in the dark."[4]  To ensure that this policy is effectuated,  "the deposition-discovery rules are to be accorded a broad and liberal treatment,"[5] and the Court is vested with discretion to impose sanctions upon parties who fail to comply with them.[6]

---

[2]*Hickman v. Taylor*, 329 U.S. 495, 500 (1947).

[3]*Id.* at 507.

[4]*Id.* at 501.

[5]*Id.* at 507.

[6]*See Nat'l Hockey League v. Metro. Hockey Club, Inc.*, 427 U.S. 639, 643 (1976) ("But here, as in other areas of the law, the most severe in the spectrum of sanctions provided by statute or rule must be available to the district court in appropriate cases, not merely to penalize those whose conduct may be deemed to warrant such sanction, but to deter those who might be tempted to such conduct in the absence of such a deterrent.").

According to Rule 37(c)(1), "If a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless."

Rule 26(a) requires parties to make initial disclosures of various pieces of information, including the names of potential witnesses and copies of documents that the parties "may use to support [their] claims or defenses."[7]  Rule 26(e) requires parties to supplement their initial disclosures and their discovery responses "in a timely manner if the party learns that in some material respect the disclosure or response is incomplete or incorrect, and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing."[8]  Thus, Rule 37(c)(1) explicitly applies to a failure to supplement responses to discovery requests.[9]

The Court considers the following factors to determine whether the failure to timely disclose or supplement was substantially justified or is harmless under Rule 37(c)(1): "(1) the prejudice or surprise to the party against whom the testimony [or evidence] is offered; (2) the ability of the party to cure the prejudice; (3) the extent to which introducing such testimony [or evidence] would disrupt the trial; and (4) the moving party's bad faith or willfulness."[10]

---

[7]Fed. R. Civ. P. 26(a)(1)(A)(i)-(ii).

[8]Fed. R. Civ. P. 26(e)(1)(A).

[9]*See* Advisory Committee Notes to the 2000 Amendment of Rule 37.

[10]*Woodworker's Supply, Inc. v. Principal Mut. Life Ins.*, 170 F.3d 985, 993 (10th Cir. 1999).

3

Defendants seek exclusion of the following under Rule 37(c)(1): (1) Plaintiff's post-discovery changes to its trade dress claims; (2) Plaintiff's pre-2000 sales data; and (3) the Declaration of Michele King.

a. Plaintiff's Post-Discovery Changes to Its Trade Dress Claims

Defendants ask the Court to exclude Plaintiff's post-discovery changes to its trade dress claims under Rule 37(c)(1), which caused significant prejudice to Defendants as they were unable to explore these changes during discovery.

The Court agrees with Defendants and will therefore disregard the changes to Plaintiff's trade dress claims made after the close of discovery.  The Court's Scheduling Order set a September 1, 2007 deadline for the completion of all discovery.[11]  This deadline was suggested by the Parties in their Rule 26(f) conference report.[12]  Plaintiff sought a two-month extension of the discovery deadline,[13] which Defendants opposed.  The Court granted the extension, but only for one month, changing the discovery deadline to October 1, 2007.

During the discovery period, Plaintiff answered an interrogatory asking it to "identify the design features, design elements, or other aspects of [its products] that compose or define the asserted trade dress rights" as follows:

> The non-functional ornamental designs and shapes of Hammerton's said lighting fixtures.  In addition, other design elements which distinguish Hammerton's products are the combination of 1) the fact that they are individually sculpted from metal, rather than being cast in a mold and mass produced, like Hammerton's other competitors; 2) how the Hammerton metals are distressed; 3)

---

[11]Docket No. 16.

[12]Docket No. 13, at 2.

[13]Docket No. 60.

the way that Hammerton creates its unique bark texture[;] and 4) the Hammerton hand-modeled finish.[14]

Plaintiff also provided a list of its allegedly infringed products and the corresponding products of Defendants that allegedly infringed thereon.  According to both Parties, Plaintiff properly supplemented this list during the discovery period.  At the close of discovery, Plaintiff's list was limited to a set of individual products.

However, on October 3, 2007, two days after the close of discovery, Plaintiff supplemented its list of infringed products to apparently include all of its products with a "Hammerton metal pine cone," a "Hammerton metal pine bough," or a "Hammerton metal bark-like texture and/or wood-like finish."[15]  Then in its opposition to Defendants' Motion for Summary Judgment Re Noninfringement of Trade Dress (the "Unfair Competition Motion"),[16] filed on January 18, 2008, Plaintiff asserted trade dress rights in its entire "Timber Creek" and "Chateau" product lines.  Plaintiff states that its "Timber Creek collection is characterized by the use of metal simulated pine bark, pine cones, pine boughs, and a wood-like modeled finish on its metal products" and that the Chateau line "involves the use of certain types of metal scroll-work, curved arms, twisted supports, faux rivet details, along with hammered and distressed finishes."[17]

At no point before the close of discovery did Plaintiff indicate that it intended to claim trade dress rights in the entire Timber Creek and Chateau product lines.  Rather, Plaintiff provided a list of individual products that were allegedly infringed, which came from multiple

---

[14]Docket No. 91 Ex. 1, at 3.

[15]Docket No. 180 Ex. 7.

[16]Docket No. 102.

[17]Docket No. 143, at 8-9.

product lines.  Furthermore, Plaintiff's interrogatory response above does not claim trade dress rights in the majority of the features listed in the definitions provided in Plaintiff's opposition memorandum.  There is no mention of the pine cone or pine bough from the Timber Creek definition or the metal scroll-work, curved arms, twisted supports, and faux rivet details found in the Chateau definition.

Plaintiff has offered no explanation for its failure to disclose its intentions to claim trade dress protection in the Chateau line during the discovery period.  This failure is extremely prejudicial to Defendants as they were unable to conduct discovery on this product line trade dress claim.  Thorough discovery is necessary to allow Defendants to explore the meaning of each of the design features claimed in the Chateau definition, whether their combination results in protectable trade dress that has acquired secondary meaning, and whether Defendants have produced infringing products.  Defendants could not cure this prejudice without seeking to reopen discovery after having already incurred the time and expense of filing summary judgment motions.  Seeking further discovery on January 18, 2008, when Plaintiff filed its opposition brief revealing its trade dress claims in the Chateau line, would clearly disrupt the May 5, 2008 trial date.  Last, although it is not clear whether Plaintiff's failure to disclose its Chateau line claims was a result of bad faith, Plaintiff was, at best, negligent.  Even assuming the absence of bad faith, the other factors clearly require the exclusion of Plaintiff's trade dress claims in the entire Chateau product line.[18]

The Timber Creek definition proffered by Plaintiff in its opposition memorandum is closely related to the October 3 "supplementation," although the October 3 supplementation

---

[18]*See Jacobsen v. Deseret Book Co.*, 287 F.3d 936, 954 (10th Cir. 2002).

appears to claim trade dress rights in each of the individual pine cone, pine bough, and bark features, whereas the Timber Creek definition claims trade dress rights in some combination of them.  Accordingly, the Court will consider the October 3 supplementation and the Timber Creek definition together.  Plaintiff contends that its October 3 supplementation was made shortly after it discovered evidence on September 25, 2007, of further infringement by Defendants in their completion of a project at the Spanish Peaks Clubhouse in Big Sky, Montana.  According to Plaintiff, it regularly updated its list of infringing products as information became available to it, asserting that it was merely doing the same thing when it discovered the Spanish Peaks project.

However, Plaintiff has submitted the Spanish Peaks evidence with its opposition memorandum and only two of Plaintiff's products allegedly infringed by Defendants at the Clubhouse contain either a pine cone, a pine bough, or a bark texturing feature.  The Spanish Peaks evidence consists of (1) an email sent by Defendant Heisterman to Wade Pannell containing a spreadsheet of information regarding the products Defendants were manufacturing for the Clubhouse; (2) copies of Plaintiff's catalog pages with markings showing the fixtures Defendants were to copy; and (3) a series of photos taken by Levi Wilson of the actual light fixtures produced by Defendants.[19]  The spreadsheet directly references a number of Plaintiff's products that Defendants were to model the Clubhouse light fixtures after.  However, only one of the products referenced in this list contains a pine cone, a pine bough, and bark texturing, and from the markings on the catalog page displaying a picture of this product, it is clear that the fixture to be produced by Defendants was to exclude the pine cone.[20]  One other product contains

---

[19]Docket No. 146 Ex. 3.

[20]Docket No. 146 Ex. 3, at TX-2.

7

only the bark texturing.[21]  Otherwise, none of Plaintiff's products contained in the spreadsheet include a pine cone, a pine bough, or bark texturing.  Likewise, none of the products in the photographs taken by Mr. Wilson of the actual light fixtures produced by Defendants for the Clubhouse contain a pine cone, a pine bough, or bark texturing.[22]  Accordingly, this evidence does not justify Plaintiff's jump from claiming trade dress rights in individual products to claiming trade dress rights in the entire Timber Creek line.

The prejudice to Defendant by virtue of Plaintiff's failure to disclose its intent to claim trade dress rights in the entire Timber Creek line is severe.  Again, thorough discovery is necessary to allow Defendants to fully prepare a defense to this product line trade dress claim. For example, it is not clear from the face of the Timber Creek definition whether all of the elements must be present, or present in some unique configuration, in order to constitute the claimed trade dress.  Without being able to explore this issue in discovery, Defendants could not even determine whether their products potentially infringe on the claimed trade dress.  Thus, Defendants could not cure this prejudice without seeking to reopen discovery.  Although trial was still some seven months away when Plaintiff made the October 3, 2007 supplementation, by the time a motion to reopen discovery could be fully briefed and heard by the Court, additional discovery could be conducted, and a round of dispositive motions could be briefed and decided by the Court, allowing further discovery likely would have resulted in continuing the May 5, 2008 trial date.  Having to reopen discovery and lose their trial date would be manifestly unfair

---

[21]Docket No. 146 Ex. 3, at TX-9.

[22]Docket No. 146 Ex. G.

8

to Defendants.[23]  Again, even assuming that Plaintiff was merely negligent in failing to properly disclose its Timber Creek trade dress claims, the Court finds that this failure was completely unjustified and very harmful to Defendants.

In sum, the Court finds that Plaintiff's failure to timely disclose its intent to claim trade dress protection in the entire Timber Creek and Chateau product lines in the face of Defendants' direct and specific discovery requests was not substantially justified and is not harmless. Accordingly, the Court will exclude the post-discovery changes made by Plaintiff to its trade dress claims and Plaintiff must rely on trade dress information that it timely disclosed or supplemented prior to the discovery deadline in opposing the Unfair Competition Motion.

    b.  Plaintiff's Pre-2000 Sales Data

Defendants also seek to exclude Plaintiff's pre-2000 sales data,[24] which Plaintiff failed to disclose during the discovery period despite Defendants' discovery requests.

The Court agrees and will disregard Plaintiff's pre-2000 sales data as Plaintiff has offered no substantial justification for its failure to disclose this data until long after the discovery deadline and shortly before filing its response to the Unfair Competition Motion.  On August 3, 2007, Defendants moved to compel production of documents reflecting Plaintiff's "sales[,] including price quotes, invoices, contracts, offers for sales, bids, advertising, advertising expenditures, etc."[25]  Defendants argued that this evidence was "unquestionably relevant" to the

---

[23]*See Praxair, Inc. v. ATMI, Inc.*, 445 F. Supp. 2d 460, 470 (D. Del. 2006).

[24]Defendants also seek to exclude Exhibits B, C, D, E, and F to the Declaration of Bill Shott.  However, there is nothing in the record indicating when these documents were produced.  Moreover, most, if not all, of these documents were created after 2000.  Accordingly, the Court will not exclude them.

[25]Docket No. 67, at 5.

question of whether Plaintiff's alleged trade dress had acquired secondary meaning.[26]  Plaintiff

opposed the Motion to Compel, stating as follows:

> While [Plaintiff] concedes that it may be required to provide some
> evidence of sales and advertising if it proceeds on a theory of "secondary
> meaning" rather than "inherent distinctiveness" for its trade dress claim, it has
> already produced sufficient evidence to meet its burden in that regard.  In contrast,
> [Defendants] insist[] that [Plaintiff] must produce documents demonstrating all of
> [Plaintiff's] sales for each of its individual products for the lifetime of those
> products.  Such requests are overbroad and unduly burdensome.[27]

In an apparent compromise of the Parties' positions, the Court ordered that Plaintiff

"produce its sales data for the products allegedly infringed by Defendants for each year since

2000, broken down by product number, with available prefixes and suffixes, and any date of sale,

name and/or address of the purchaser included in the database entry."[28]

Despite Plaintiff's representations to the Court, its refusal to disclose the requested sales

data, and its opposition to Defendants' Motion to Compel, Plaintiff produced its tax returns for

years 1997-1999 on January 9, 2008, and an exhibit breaking down its 1999 sales data by product

line on January 16, 2008, months after the close of discovery and less than ten days before filing

its response to the Unfair Competition Motion.  Plaintiff argues that it is entitled to respond to

the arguments in the Unfair Competition Motion by locating evidence required to rebut them.

However, Plaintiff could not have been surprised that its sales data would be important to a

determination of secondary meaning; it acknowledged as much in the briefing on the Motion to

Compel.

---

[26]*Id.*

[27]Docket No. 75, at 4.

[28]Docket No. 89, at ¶ 1.

Moreover, Plaintiff's failure to timely disclose the pre-2000 sales data was harmful to Defendants.  Defendants sought Plaintiff's sales data in a form broken down by individual product so as to properly attribute sales to products embodying Plaintiff's claimed trade dress. Plaintiff's pre-2000 sales data is based in part on its 1997, 1998, and 1999 tax returns.  This information cannot be broken down by product.  Likewise, the 1999 data found in the January 16, 2008 disclosure is broken down by product line but not by individual product.  Inspection of Plaintiff's pre-2000 catalogs shows that many of Plaintiff's products did not contain a pine cone or a pine bough, making it impossible to determine how much of the pre-2000 sales were attributable to products embodying the Timber Creek trade dress.  By virtue of Plaintiff's failure to disclose its pre-2000 sales data, Defendants were unable to obtain the specific data needed to properly prepare a defense on whether the Timber Creek line had acquired the secondary meaning necessary to be protectable as trade dress.  Additionally, Defendants were unable to question Plaintiff regarding the pre-2000 sales data in its Rule 30(b)(6) deposition.

In order to cure this harm, Defendants would need to reopen discovery, potentially delaying trial.  As discussed above, this would be manifestly unfair to Defendants, even assuming that Plaintiff was only negligent in its appraisal of the need to use the pre-2000 sales data to support its claims.  Accordingly, the Court will exclude Plaintiff's pre-2000 sales data, including its 1997-1999 tax returns and the 1999 data found in Plaintiff's January 16, 2008 disclosure.[29]

---

[29]*See* Document "Hamm 1120" found at Docket No. 180 Ex. 4.

c.  King Declaration

Lastly, Defendants ask the Court to exclude the Declaration of Michele King, who was not revealed by Plaintiff as a potential witness until shortly before filing her Declaration with its opposition memoranda.

The Court agrees and will disregard the Declaration of Ms. King.  Plaintiff has made no attempt whatsoever to justify its waiting to identify Ms. King as a person having discoverable information until months after the close of discovery and shortly before filing its opposition memoranda.  In the Declaration itself, Ms. King indicates that she had a conversation with Mr. Shott in 2006 regarding an important part of her Declaration's content.  Thus, Plaintiff was aware that Ms. King was a potential witness long before Defendants filed their motions for summary judgment.  The Court simply will not countenance waiting until after discovery closes to reveal known witnesses.

II.  Defendants' Personal Knowledge and Hearsay Objections

Federal Rule of Civil Procedure 56(e) requires that affidavits submitted in connection with a motion for summary judgment must "be made on personal knowledge."  "Under the personal knowledge standard, an affidavit is inadmissible if the witness could not have actually perceived or observed that which he testifies to."[30]  "At the summary judgment stage, evidence need not be submitted 'in a form that would be admissible at trial.'"[31]  Rather, "the content or substance of the evidence must be admissible."[32]

---

[30]*Argo v. Blue Cross and Blue Shield, Inc.*, 452 F.3d 1193, 1200 (10th Cir. 2006) (internal quotation marks omitted).

[31]*Id.* at 1199 (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986)).

[32]*Id.* (quoting *Thomas v. Int'l Bus. Machs.*, 48 F.3d 478, 485 (10th Cir. 2005)).

a.  Shott Declaration

Defendants object to a number of paragraphs in the Declaration of Bill Shott on two grounds: (1) lack of personal knowledge, and (2) hearsay.

1.  Lack of Personal Knowledge

Defendants ask the Court to strike paragraphs 17-28 and 33-35 of the Declaration of Mr. Shott, Plaintiff's president, asserting that Mr. Shott's testimony can not be based on personal knowledge because he was not employed by Plaintiff until 2005.  The cited paragraphs of Mr. Shott's Declaration primarily concern Plaintiff's sales data, products, and advertising, as well as Plaintiff's relationship with David Holbrook.

Plaintiff contends that Mr. Shott, as Plaintiff's president, "oversee[s] the manufacture, marketing and sales of its products, as well as the creation and maintenance of its financial records,"[33] and therefore has personal knowledge of the company's finances.  Thus, Mr. Shott may properly testify regarding these matters, even though they may have occurred prior to his hiring as Plaintiff's president.  Plaintiff also contends that Mr. Shott's testimony regarding its financial information is an admissible summary under Federal Rule of Evidence 1006.

The Court agrees with Plaintiff and will consider Mr. Shott's Declaration in evaluating Defendants' summary judgment motions.[34]  For purposes of summary judgment—where evidence does not have to be submitted in admissible form—Mr. Shott, as Plaintiff's president, may summarize Plaintiff's financial and advertising data, even though that data was created

---

[33]Docket No. 147 Ex. 7, at ¶ 4.

[34]However, for the reasons discussed above, the Court will not consider Mr. Shott's testimony regarding the pre-2000 sales data found in paragraph 17.

before Mr. Shott began working for Plaintiff.  Additionally, the paragraphs dealing with

Plaintiff's relationship with Mr. Holbrook are within Mr. Shott's personal knowledge.

2.  Hearsay

Defendants contend that paragraphs 9-15 of Mr. Shott's Declaration are hearsay and

should be stricken.  These paragraphs outline a conversation between Mr. Shott and Larry

Sargeant, the proprietor of Great Mountain Furniture and Flooring, in which Mr. Sargeant told

Mr. Shott that Defendants would build anything out of Plaintiff's catalog at a lower cost.

Plaintiff contends that these statements are admissible as nonhearsay under Federal Rule of

Evidence 801(d)(2).

Rule 801(d)(2) reads in relevant part: "[a] statement is not hearsay if . . .[t]he statement is

offered against a party and is . . . a statement by the party's agent or servant concerning a matter

within the scope of the agency or employment, made during the existence of the relationship."

The Court will disregard Mr. Shott's testimony concerning Mr. Sargeant's purported

statements as inadmissable hearsay.  Plaintiff has offered no evidence that would prove the

existence of an agency relationship between Mr. Sargeant and Defendants.  To the contrary, Mr.

Shott himself states that Mr. Sargeant was the proprietor of Great Mountain.  This is not enough

for the Court to conclude that Mr. Sargeant was an agent of Defendants such that his alleged

statements could qualify as a party admission.  Accordingly, the Court will disregard paragraphs

9, 12, 13, 14, and 16 of Mr. Shott's Declaration, as well as Exhibit A attached thereto.

b.  Wilson Declaration

Defendants ask the Court to strike the testimony of Levi Wilson found in paragraph 28 of

his Declaration concerning a statement made to him by Lisa Marie, claiming that it is

14

inadmissible hearsay.  Plaintiff contends that this testimony is not hearsay because it is not offered for the truth of the matter asserted in Ms. Marie's statement.

The Court agrees with Plaintiff and will consider Mr. Wilson's testimony regarding Ms. Marie's statement as it is not being offered to prove the truth of the matter asserted in Ms. Marie's statements and is, therefore, not hearsay.[35]  In paragraph 28, Mr. Wilson testifies as follows: "At that time, I met with Lisa Marie, a Montana-based interior designer, who mentioned to me that she liked [Plaintiff's] light fixtures at the new Spanish Peaks' clubhouse in Big Sky, Montana."  Plaintiff does not cite this testimony to prove that Ms. Marie liked Plaintiff's light fixtures at the Spanish Peaks Clubhouse or that the light fixtures in the Spanish Peaks Clubhouse were made by Plaintiff.  Rather, Plaintiff cites to this testimony for the proposition that "[t]he Spanish Peaks fixtures have already been confused by [a] member of the public as coming from [Plaintiff]."[36]  Accordingly, this testimony is not hearsay and will not be disregarded.

III.  Conclusion

In summary, the Court will exclude the following information from its consideration of Defendants' summary judgment motions: (1) Plaintiff's post-discovery changes to its trade dress claims; (2) Plaintiff's pre-2000 sales data; (3) the Declaration of Michele King; and (4) paragraphs  9, 12, 13, 14, 16, and 17, and Exhibit A, of the Declaration of Bill Shott.  The Court will deny Defendants' Consolidated Motion in all other respects.

---

[35]Federal Rule of Evidence 801(c) defines hearsay as "a statement, other than one made by the declarant, while testifying at trial or hearing, offered in evidence to prove the truth of the matter asserted."

[36]Docket No. 143, at xv ¶ 40.

15

In light of the disposition of the Consolidated Motion with respect to Plaintiff's post-discovery changes to its trade dress claims, and in fairness to Plaintiff, the Court will order further briefing on the Unfair Competition Motion.

It is therefore

ORDERED that Defendants' Consolidated Motion to Strike and Exclude [Docket No. 179] is GRANTED IN PART AND DENIED IN PART as outlined above.  It is further

ORDERED that Plaintiff file a supplemental memorandum regarding the Unfair Competition Motion [Docket No. 102] on or before April 10, 2008, and that Defendant file a reply memorandum on or before April 24, 2008.  The argument portion of the Parties' supplemental memoranda shall not exceed ten pages.

DATED March 27, 2008.

BY THE COURT:

_____
TED STEWART
United States District Judge

16

United States District Court
for the
District of Utah
March 27, 2008

******MAILING CERTIFICATE OF THE CLERK******

RE:   Hammerton v. Heisterman
       2:06-cv-00806-TS-SA

Jerome Romero
Lewis M. Francis
JONES WALDO HOLBROOK & MCDONOUGH (SLC)
170 S MAIN ST STE 1500
SALT LAKE CITY, UT 84101

Kyle W. Grimshaw
Robert S. Rapp
MADSON & AUSTIN
15 W SOUTH TEMPLE
900 GATEWAY TOWER WEST
SALT LAKE CITY, UT 84101-1526

_____

Aaron Paskins, Deputy Clerk