IN THE UNITED STATES COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| HAMMERTON, INC., a Utah corporation,<br><br>　　　Plaintiff, | MEMORANDUM DECISION AND ORDER ON DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT |
| 　　　　vs. | |
| ROBERT HEISTERMAN, individually and dba KAHM DESIGN, and KAHM INDUSTRIES, LLC, a Utah limited liability company,<br><br>　　　Defendants. | Case No. 2:06-CV-00806 TS |

Plaintiff Hammerton, Inc., and Defendants Robert Heisterman and Kahm Industries, LLC ("Kahm Design"), are competing manufacturers of high-end "rustic" light fixtures. In its Amended Complaint, Plaintiff alleges four causes of action against Defendants: (1) unfair competition under the Lanham Act[1]; (2) unfair competition under Utah common law; (3) trade secret misappropriation; and (4) design patent infringement. The Court previously granted summary judgment in favor of Defendants on Plaintiff's design patent claim. Defendants now move for summary judgment on Plaintiff's remaining claims.

---

[1]15 U.S.C. § 1125(a).

1

Currently before the Court are Defendants' three motions for summary judgment, styled as follows: (1) Motion for Summary Judgment RE Noninfringement of Trade Dress (the "Unfair Competition Motion"); (2) Motion for Summary Judgment RE Claims of Trade Secret Misappropriation (the "Trade Secret Motion"); and (3) Motion for Summary Judgment RE: "Trademark Infringement" (the "Trademark Motion").  As both Parties agree that Plaintiff does not assert a claim for trademark infringement, the Trademark Motion will be denied as moot.

The Court heard oral argument on the Unfair Competition Motion and the Trade Secret Motion at a hearing held on March 10, 2008, and took the matter under advisement.  After ruling on Defendants' Consolidated Motion to Strike and Exclude—filed by Defendants in connection with their summary judgment motions—the Court requested supplemental briefing on the Unfair Competition Motion.  Having carefully considered the Parties' memoranda, the applicable law, and the record before it, the Court will grant the Unfair Competition Motion and deny the Trade Secret Motion.

## I.  STANDARD OF REVIEW

Summary judgment is proper if the moving party can demonstrate that there is no genuine issue of material fact and it is entitled to judgment as a matter of law.[2]  In considering whether genuine issues of material fact exist, the Court determines whether a reasonable jury could return a verdict for the nonmoving party in the face of all the evidence presented.[3]  The Court is

---

[2]*See* Fed. R. Civ. P. 56(c).

[3]*See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986); *Clifton v. Craig*, 924 F.2d 182, 183 (10th Cir. 1991).

2

required to construe all facts and reasonable inferences in the light most favorable to the nonmoving party.[4]

## II.  BACKGROUND

Plaintiff began manufacturing its handmade rustic light fixtures and other furniture in 1996 under the name "Mountain Moose Design."[5]  According to Plaintiff's President, Bill Shott, "the market for [Plaintiff's] light fixture designs is quite small, given their unique styling, as well as the high price of such hand-crafted products."[6]  Nonetheless, Plaintiff has enjoyed considerable business success, garnering nearly $6 million of revenue in 2006.  Likewise, Plaintiff's product base, which now contains six different lines of light fixtures, has significantly expanded since its original 1996 catalog.

Defendant Heisterman is a former employee of Plaintiff.  He worked for approximately two years in Plaintiff's product development department before leaving sometime in early 2000.  Around March 2000, Defendant Heisterman formed Kahm Design and began producing competing products shortly thereafter.  Plaintiff and Defendants compete in the same market for high-end "rustic" light fixtures.  Defendants manufacture a number of products that are very similar to those manufactured by Plaintiff.

Plaintiff claims that Defendants violated §§ 43(a) and 43(c) of the Lanham Act, as well as Utah common law, by "knocking-off" Plaintiff's light fixture designs.  According to Plaintiff, Defendants manufacture products for customers straight out of Plaintiff's catalog at a significant

---

[4]*See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Wright v. Southwestern Bell Tel. Co.*, 925 F.2d 1288, 1292 (10th Cir. 1991).

[5]Docket No. 146 Ex. 4, at ¶ 6.

[6]Docket No. 147 Ex. 7, at ¶ 13.

discount below Plaintiff's prices.  Plaintiff claims trade dress rights in a number of products allegedly copied, manufactured, and sold by Defendants.  Accordingly, Plaintiff produced a list during discovery containing some 50 products from five different product lines that Defendants have allegedly infringed.  However, as explained in detail below, Plaintiff has not properly identified the combination or combinations of design elements that comprise its alleged trade dress or trade dresses.

Plaintiff also claims that Defendants have misappropriated its customer list, which, according to Plaintiff, is a trade secret protected under the Utah Uniform Trade Secrets Act.  On July 27, 2006, Mr. Shott emailed a copy of Plaintiff's customer list for the Rocky Mountain region to David Holbrook, Plaintiff's long-time sales representative.  The list contained some 535 customers along with their contact information.  Shortly after receiving the list, Mr. Holbrook terminated his relationship with Plaintiff and began representing Defendants.  Plaintiff contends that Defendants misappropriated this list as evidenced by the customer names common to both Plaintiff's customer list and Defendants' customer list.

## III.  DISCUSSION

Defendants assert they are entitled to summary judgment on each of Plaintiff's three remaining claims: (1) unfair competition under the Lanham Act; (2) unfair competition under Utah common law; and (3) trade secret misappropriation.

### A.  Lanham Act Claims

According to Plaintiff, its cause of action for unfair competition under the Lanham Act is actually two separate claims: (1) trade dress infringement under § 43(a); and (2) dilution by tarnishment under § 43(c).  The Court will address each in turn.

4

*1. Trade Dress Infringement*

Section 43(a) of the Lanham Act provides a federal cause of action for trade dress infringement.[7]  Although trade dress protection was originally limited to product packaging, it has since been extended to "the design of a product."[8]  "The trade dress of a product is its overall image and appearance, and may include features such as size, shape, color or color combinations, texture, graphics, and even particular sales techniques."[9]  Additionally, a plaintiff may seek trade dress rights in a line or grouping of products "by establishing that the 'overall look' in each separate product is 'consistent.'"[10]

To recover for trade dress infringement under § 43(a), "a plaintiff must show: (1) The trade dress is inherently distinctive or has become distinctive through secondary meaning; (2) There is a likelihood of confusion among consumers as to the source of the competing products; and (3) The trade dress is nonfunctional."[11]  Because product designs cannot be inherently distinctive, a plaintiff seeking protection for product design trade dress must prove that the design has acquired secondary meaning.[12]

---

[7]*General Motors Corp. v. Urban Gorilla, LLC*, 500 F.3d 1222, 1226 (10th Cir. 2007).

[8]*Wal-Mart Stores v. Samara Bros., Inc.*, 529 U.S. 205, 209 (2000).

[9]*Sally Beauty Co. v. Beautyco, Inc.*, 304 F.3d 964, 977 (10th Cir. 2002).

[10]*Yurman Design, Inc. v. PAJ, Inc.*, 262 F.3d 101, 116 (2d Cir. 2001) (quoting *Walt Disney Co. v. Good Times Home Video Corp.*, 830 F. Supp. 762, 766 (S.D.N.Y. 1993)); *see also Rose Art Indus., Inc. v. Swanson*, 235 F.3d 165, 173 (3d Cir. 2000) ("In presenting a case for trade dress infringement, a plaintiff can group together any number of products in any way it sees fit, as long as the products have a consistent overall look.").

[11]*Urban Gorilla*, 500 F.3d at 1227.

[12]*Wal-Mart Stores*, 529 U.S. at 212, 216.

However, before reaching the issues of secondary meaning, likelihood of confusion, and functionality, a plaintiff asserting trade dress rights in a product design "must articulate the design elements that compose the trade dress."[13]  The "focus on the overall look of a product [or products] does not permit a plaintiff to dispense with an articulation of the specific elements which comprise its distinct dress."[14]  The jury cannot make determinations regarding secondary meaning, likelihood of confusion, and functionality, "without knowing precisely what the plaintiff is trying to protect."[15]  Moreover, "courts will . . . be unable to shape narrowly-tailored relief if they do not know what distinctive combination of ingredients deserves protection."[16]  Consequently, a trade dress plaintiff's failure to identify the specific elements of its trade dress entitles the defendant to judgment as a matter of law on a trade dress claim.[17]

In this case, Defendants are entitled to summary judgment on Plaintiff's trade dress infringement claim because Plaintiff has failed to properly articulate the design elements that

---

[13]*Yurman Design*, 262 F.3d at 116.  Although the *Yurman Design* case dealt with a plaintiff asserting trade dress protection in an entire line of products, the requirement of listing the design elements that constitute the claimed trade dress applies with equal force to product design trade dress claims in individual products.  *See* J. Thomas McCarthy, 1 *McCarthy on Trademarks and Unfair Competition* § 8:3 (4th ed. 1992) ("[I]t will not do to solely identify in litigation such combination as 'the trade dress.'  Rather, the discrete elements which make up that combination should be separated out and identified in a list.  Only then can the court and the parties coherently define exactly what the trade dress consists of and determine whether that trade dress is valid and if what the accused is doing is an infringement."); *Tumblebus Inc. v. Cranmer*, 399 F.3d 754, 768 (6th Cir. 2005) ("To recover for trade-dress infringement under § 43(a) of the Lanham Act, a party must first identify what particular elements or attributes comprise the protectable trade dress.").

[14]*Yurman Design*, 262 F.3d at 117 (quoting *Landscape Forms, Inc. v. Columbia Cascade Co.*, 113 F.3d 373, 381 (2d Cir. 1997)) (emphasis removed) (internal quotation marks omitted).

[15]*Id.*

[16]*Id.* (quoting *Landscape Forms*, 113 F.3d at 381).

[17]*Id.* at 118.

comprise its alleged trade dress.  Despite two rounds of briefing and a hearing on the Unfair

Competition Motion, the Court still does not know what Plaintiff's alleged trade dress or trade

dresses look like.  In fact, the record shows that Plaintiff's trade dress claims have substantially

evolved during the history of the case with the most significant changes coming after the close of

discovery.

During the discovery period, Plaintiff answered an interrogatory ("Interrogatory No. 2")

asking it to "identify the design features, design elements, or other aspects of [its products] that

compose or define the asserted trade dress rights" as follows:

> The non-functional ornamental designs and shapes of Hammerton's said lighting
> fixtures.  In addition, other design elements which distinguish Hammerton's
> products are the combination of 1) the fact that they are individually sculpted
> from metal, rather than being cast in a mold and mass produced, like
> Hammerton's other competitors; 2) how the Hammerton metals are distressed; 3)
> the way that Hammerton creates its unique bark texture[;] and 4) the Hammerton
> hand-modeled finish.[18]

Plaintiff also provided a list of its allegedly infringed products and the corresponding products of

Defendants that allegedly infringed thereon.[19]  At the close of discovery, Plaintiff's list was

limited to a set of individual products.  Plaintiff did not modify its response to Interrogatory No.

2 within the discovery period, or at any time for that matter.

On October 3, 2007, two days after the close of discovery, Plaintiff supplemented its list

of infringed products to apparently include all of its products with a  "Hammerton metal pine

cone," a "Hammerton metal pine bough," or a "Hammerton metal bark-like texture and/or wood-

---

[18]Docket No. 91 Ex. 1, at 3.

[19]Docket No. 180, at Ex. 9.

like finish."[20]  Then in its opposition to the Unfair Competition Motion filed on January 18, 2008, Plaintiff appeared to assert trade dress rights in its entire "Timber Creek" and "Chateau" product lines.  Plaintiff stated that its "Timber Creek collection is characterized by the use of metal simulated pine bark, pine cones, pine boughs, and a wood-like modeled finish on its metal products" and that the Chateau line "involves the use of certain types of metal scroll-work, curved arms, twisted supports, faux rivet details, along with hammered and distressed finishes."[21]

In an Order dated March 27, 2008, the Court ruled that it would disregard the post-discovery changes to Plaintiff's trade dress claims for purposes of the Unfair Competition Motion.[22]  More specifically, the Court precluded Plaintiff from relying on the broad definitions of its alleged trade dress that were revealed after the close of discovery—including those proffered in Plaintiff's opposition memorandum—because Plaintiff's failure to timely disclose them during the discovery period was unjustified and extremely prejudicial to Defendants.

In light of this decision, the Court provided Plaintiff with an opportunity to file a supplemental memorandum on the Unfair Competition Motion.  However, instead of outlining its trade dress claims based on an articulation of a combination of design elements constituting the alleged trade dress, which was properly disclosed during the discovery period, Plaintiff's supplemental memorandum merely attempts to avert the Court's March 27 Order.

---

[20]Docket No. 180, at Ex. 7.

[21]Docket No. 143, at 8-9.

[22]Docket No. 212.

Despite the clear language in its opposition memorandum to the contrary,[23] Plaintiff claims that it has not asserted trade dress rights in the entire Timber Creek and Chateau product lines. Plaintiff states that it "has always claimed that [Defendants are] knocking off particular light fixture designs" and, accordingly, it revealed the products at issue during the discovery period.[24] Plaintiff further asserts that it simply "grouped" the infringed products disclosed during the discovery period "for purposes of reference and analysis" in its opposition memorandum.[25] According to Plaintiff, "[t]his grouping did not change the nature of [Plaintiff's] unfair competition claims, or add to the number of light fixtures at issue, but only served to better identify the product for analysis."[26]

The Court cannot accept Plaintiff's argument, which turns the discovery process on its head. The design elements that make up Plaintiff's alleged trade dress or trade dresses are matters of fact that, by definition, have been within Plaintiff's knowledge from the inception of the case. Accordingly, Plaintiff was obligated to disclose its alleged trade dress, including an articulation of the combination of design elements that constitutes that trade dress, during discovery pursuant to Defendants' discovery requests. Despite the supplemental briefing opportunity, Plaintiff has not shown the Court any disclosure made during the discovery period where Plaintiff articulated the combinations of design elements upon which Plaintiff relies in its opposition memorandum. In fact, other than Plaintiff's response to Interrogatory No. 2, Plaintiff

---

[23]*Id.* at 7 ("Hammerton's Timber Creek and Chateau Product Lines Have Protectible [sic] Trade Dress Elements.").

[24]Docket No. 222, at 7.

[25]*Id.* at 6-7.

[26]*Id.* at 8.

has not pointed to any disclosure made during the discovery period that articulates a combination of design features comprising its alleged trade dress.[27]

In "grouping" its infringed products in its opposition memorandum, Plaintiff was, in reality, articulating two new combinations of design features (*i.e.*, two new trade dresses) that were not disclosed during discovery. Plaintiff cannot wait until after the close of discovery, indeed until filing its opposition to summary judgment, to disclose the combination of design elements that comprise its trade dress claims. Doing so deprived Defendants of the opportunity to conduct discovery with respect to the specific elements of each trade dress and whether their combination has acquired secondary meaning, is nonfunctional, and is likely to be confused with Defendants' products. If the Court were to accept Plaintiff's argument, no defendant would ever be able to properly prepare a defense against a product design trade dress claim because a trade dress plaintiff could simply wait until after the close of discovery to reveal the combination of design elements that make up its trade dress. Therefore, as already stated by the Court in its March 27 Order, Plaintiff cannot rely on the trade dress definitions stated in its opposition brief.

As noted above, Plaintiff makes no attempt in its supplemental memorandum to identify an articulation of a combination of design elements, properly disclosed during discovery, that constitutes its claimed trade dress.[28] Furthermore, Plaintiff has completely abandoned the list of

---

[27]In its supplemental memorandum, Plaintiff states in conclusory fashion: "Moreover, there were numerous depositions after [Plaintiff's response to Interrogatory No. 2] which further fleshed out the trade dress elements and particular product designs at issue." *Id.* at 7. However, Plaintiff offers no citation to the record to support this statement. The Court is "not obligated to comb the record in order to make [Plaintiff's] arguments for [it]." *Mitchell v. City of Moore*, 218 F.3d 1190, 1199 (10th Cir. 2000).

[28]This problem is exacerbated because it is unclear whether Plaintiff (1) claims separate trade dress rights in each of the allegedly-infringed products disclosed by Plaintiff during discovery or (2) claims a trade dress that is embodied in multiple products. Assuming the

design elements contained in its response to Interrogatory No. 2 as a possible definition.  At no

point in either its opposition memorandum or its supplemental memorandum, which was

submitted after the Court's March 27 Order, does Plaintiff offer the response to Interrogatory No.

2 as a definition for its alleged trade dress.  As Plaintiff does not rely on the response to

Interrogatory No. 2 as the working definition of its trade dress, neither will the Court.

Accordingly, in the absence of any properly disclosed identification of the combination of design

elements that comprise Plaintiff's alleged trade dress or trade dresses, Defendants are entitled to

summary judgment on Plaintiff's trade dress infringement claim.

Notably, even if Plaintiff had opted to rely on the list of design elements set forth in its

response to Interrogatory No. 2, that list does not describe a trade dress entitled to protection

under § 43(a) of the Lanham Act.  Plaintiff's response reads as follows:

> The non-functional ornamental designs and shapes of Hammerton's said lighting
> fixtures.  In addition, other design elements which distinguish Hammerton's
> products are the combination of 1) the fact that they are individually sculpted
> from metal, rather than being cast in a mold and mass produced, like
> Hammerton's other competitors; 2) how the Hammerton metals are distressed; 3)
> the way that Hammerton creates its unique bark texture[;] and 4) the Hammerton
> hand-modeled finish.[29]

The first three of the four elements in this combination appear to claim the processes by which

Plaintiff produces its light fixtures.  However, § 43(a) of the Lanham Act does not offer

protection for manufacturing processes, which are the exclusive province of patent law.

---

former, Plaintiff must articulate the design elements that constitute the distinct trade dress for
each individual product.  Plaintiff has not done so.  Assuming the latter, Plaintiff must articulate
the combination of design elements that make up the claimed dress and show that each product in
the grouping or product line embodies that dress (*i.e.*, that each product has a consistent overall
look).  Plaintiff has done neither.

[29]Docket No. 91 Ex. 1, at 3.

Moreover, to the extent these elements might refer to the appearance created by Plaintiff's manufacturing processes, Plaintiff has not specified what that appearance is.  Plaintiff has submitted its catalogs, which contain pictures of the products on its list of infringed products.[30]  However, these pictures show a number of distressed metals and finishes that are very different in appearance.  Additionally, the majority of the allegedly infringed products do not contain both a distressed metal element and a bark texturing element and, thus, do not embody the same "overall look" (*i.e.*, the claimed trade dress).  Simply stated, even looking at pictures of the allegedly infringed products, the Court cannot discern what the trade dress vaguely described in Plaintiff's response to Interrogatory No. 2 looks like.  And, remarkably, Plaintiff has made no attempt to point it out.  Without knowledge of what Plaintiff's alleged trade dress looks like, the Court cannot even begin to determine whether it might be entitled to protection under the Lanham Act.

In conclusion, it appears to the Court that much of the confusion surrounding Plaintiff's trade dress claims stems from a fundamental misunderstanding of the protection afforded under § 43(a) of the Lanham Act.  Section 43(a) does not protect manufacturers from having their products copied by competitors.  "The Lanham Act does not exist to reward manufacturers for their innovation in creating a particular device; that is the purpose of the patent law and its period of exclusivity."[31]  Rather, "the underlying purpose of the Lanham Act . . . is protecting consumers and manufacturers from deceptive representations of affiliation and origin."[32]

---

[30]Docket No. 146 Ex. 4, at Exs. A-E.

[31]*Traffix Devices, Inc. v. Marketing Displays, Inc.*, 532 U.S. 23, 35 (2001).

[32]*Landscape Forms*, 113 F.3d at 375.

Accordingly, trade dress protection is directly tied to the combination of specific features (*i.e.*, the trade dress) embedded in a product that identifies the source of the product to the consuming public.  Without a careful identification of the combination of design features that comprise the trade dress, and a showing that the trade dress has obtained secondary meaning and is nonfunctional, trade dress law could easily be used to achieve patent-like protection for products without regard to the requirements and limitations of patent law.[33]  This potential for misuse of trade dress law is of particular concern in product design cases, as "product design almost invariably serves purposes other than source identification."[34]  Thus, "courts have exercised particular 'caution' when extending protection to product designs."[35]

In bringing its trade dress infringement claim, Plaintiff seeks to prevent Defendants from "knocking off" its products—relief that is simply not afforded under the Lanham Act.  As highlighted in Plaintiff's supplemental memorandum, "Plaintiff has always claimed that [Defendants are] knocking off particular light fixture designs."[36]  This focus is illustrated by the following statement, made by Plaintiff's counsel at the March 10, 2008 Hearing:

> Now [Defendants' counsel] raises some issues and tries to say there is no way you can figure out how to enjoin us from doing what we're doing.  I think it's pretty clear that we can craft such an injunction, which is *stop knocking off products out of their catalog*.  We've given specific product numbers and we've shown where they have knocked off those specific product numbers.  It's not a question of trying to define this in this amorphous way, you can't have something with scrollwork, you can't have something with hammered finishes.  You just can't go

---

[33]*See Qualitex Co. v. Jacobson Prods. Co.*, 514 U.S. 159, 164-65 (1995).

[34]*Wal-Mart Stores*, 529 U.S. at 213.

[35]*Landscape Forms*, 113 F.3d at 380 (quoting *Jeffrey Milstein v. Greger, Lawlor, Roth, Inc.*, 58 F.3d 27, 32 (2d Cir. 1995)).

[36]Docket No. 222, at 7.

into our catalog and build the things out of our catalog at a discount for other customers.[37]

However, Plaintiff is not entitled under the Lanham Act to prevent Defendants from copying its products without carefully articulating the combination of design elements in those products that is nonfunctional and has achieved secondary meaning.  As noted above, Plaintiff has completely failed to properly identify the combination of design elements that constitute its trade dress.

Therefore, for each of the reasons stated above, the Court will grant the Unfair Competition Motion with respect to Plaintiff's trade dress infringement claims under §43(a) of the Lanham Act.[38]

### 2. Dilution by Tarnishment

In addition to its claims for trade dress infringement under § 43(a), Plaintiff contends that it is entitled to injunctive relief under § 43(c) for dilution by tarnishment because Defendants are allegedly flooding the market with products that are of inferior quality.

A plaintiff is entitled to injunctive relief under § 43(c) for dilution by tarnishment of its mark only where the mark is "famous."[39]  A mark is "famous" for purposes of § 43(c) "if it is widely recognized by the general consuming public of the United States as a designation of source of the goods or services of the mark's owner."[40]

---

[37]Transcript of March 10, 2008 Hearing, at 40:16-41:2 (emphasis added).

[38]In its supplemental memorandum, Plaintiff asks the Court to reconsider its March 27, 2008 ruling with respect to the Declaration of Michele King and Plaintiff's pre-2000 sales data. In light of the above disposition of Plaintiff's trade dress infringement claims, those issues are now moot.  Accordingly, the Court declines to reconsider its March 27, 2008 Order.

[39]15 U.S.C. § 1125(c)(1).

[40]Id. at § 1125(c)(2).

14

As stated above, Plaintiff has failed to show that its alleged trade dress is entitled to protection under the Lanham Act.  Accordingly, Defendants are entitled to summary judgment on Plaintiff's § 43(c) claim.  Moreover, even if Plaintiff had properly defined its alleged trade dress, Plaintiff has offered no evidence to show that its trade dress is widely recognized by the general public.  Rather, Plaintiff admits that "the market for [its] light fixture products is quite small, given their unique styling, and the price of such high-end hand-crafted fixtures."[41] Accordingly, the Court will grant the Unfair Competition Motion with respect to Plaintiff's claim for dilution by tarnishment under § 43(c) of the Lanham Act.

B.  Common Law Unfair Competition

Plaintiff also asserts a common law unfair competition claim against Defendants, claiming that Defendants have passed off their goods in the marketplace as those of Plaintiff and that in so doing Defendants have misappropriated Plaintiff's good will.

The Supreme Court has made clear that state laws are preempted by federal patent law to the extent that they purport to grant "patent-like protection to intellectual creations which would otherwise remain unprotected as a matter of federal law."[42]  Importantly, federal patent law leaves room for states to "protect businesses in the use of their trademarks, labels, or distinctive dress in the packaging of goods so as to prevent others, by imitating such markings, from misleading purchasers as to the source of the goods."[43]  Thus, state unfair competition laws, which protect "against copying of nonfunctional aspects of consumer products which have

---

[41]Docket No. 143, at xi ¶ 13.

[42]*Bonito Boats, Inc. v. Thunder Craft Boats, Inc.*, 489 U.S. 141, 156 (1989).

[43]*Id.* at 154 (quoting *Sears Roebuck & Co. v. Stiffel Co.*, 376 U.S. 225, 232 (1964)) (internal quotation marks omitted).

acquired secondary meaning *such that they operate as a designation of source*," are not preempted.[44]  However, where a state law provides protection to product design features regardless of whether they operate as a designation of source, that law conflicts with federal patent law and is preempted.[45]

The Court finds that Defendants are also entitled to summary judgment on Plaintiff's common law unfair competition claim.  Plaintiff's common law unfair competition claim is based entirely on Defendant's alleged copying of Plaintiff's light fixtures.  However, as detailed above, Plaintiff has failed to properly identify the combination of design features embodied in its products that operates as a designation of source—*i.e.*, its alleged trade dress.  Without a clear understanding of what Plaintiff's alleged trade dress is, no jury can reasonably find that the alleged trade dress does in fact operate as a designation of source such that its imitation could mislead purchasers as to the source of Plaintiff's products.  And, if a jury cannot reasonably find that Plaintiff's alleged trade dress actually operates as a designation of source, then Plaintiff cannot recover for unfair competition under Utah common law.  To conclude otherwise would require the Court to assume that Utah common law protects against copying product designs without regard to whether they operate as a designation of source, which it cannot do without being preempted by federal patent law.  Accordingly, the Court will grant the Unfair Competition Motion with respect to Plaintiff's action for common law unfair competition.

---

[44]*Id.* at 158 (emphasis added).

[45]*See Midwest Indus., Inc. v. Karavan Trailers, Inc.*, 175 F.3d 1356, 1365 (Fed. Cir. 1999) ("If under the rubric of 'trade dress' protection, state law should purport to give [the plaintiff] the right to exclude others from using a feature that confers a significant non-reputation-related market advantage over its competitors, the state law cause of action would conflict with federal patent law principles and be preempted.").

C.  Trade Secret Misappropriation

Under the Utah Uniform Trade Secrets Act (the "UTSA"), a plaintiff may seek damages and injunctive relief for "actual or threatened" misappropriation of its trade secret.[46]  Analysis under the UTSA takes place in two steps.  First, the finder of fact must determine whether the information in question constitutes a trade secret entitled to protection.  Second, the finder of fact must determine whether the trade secret was misappropriated.

*1.  Existence of a Trade Secret*

Plaintiff claims that its customer list is entitled to protection as a trade secret under the UTSA.  Defendants contend that Plaintiff disclosed its customer list to Mr. Holbrook, Plaintiff's sales representative, without any confidentiality obligations and, therefore, cannot claim trade secret protection.

The threshold issue in any trade secret misappropriation case under the UTSA is "whether, in fact, there is a trade secret to be misappropriated."[47]  Whether certain information "constitutes a trade secret is a question of fact."[48]  According to the UTSA,

"Trade Secret" means information, including a formula, pattern, compilation, program, devise, method, technique, or process that:

(a) derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and

---

[46]Utah Code Ann. §§ 13-24-3(1), 13-24-4(1).

[47]*Medspring Group, Inc. v. Feng*, 368 F. Supp. 2d 1270, 1276 (D. Utah 2005) (quoting *Novell, Inc. v. Timpanogos Research Group, Inc.*, 45 U.S.P.Q.2d 1197, 1212 (Utah Dist. Ct. 1998)).

[48]*Envirotech Corp. v. Callahan*, 872 P.2d 487, 494 (Utah Ct. App. 1994).

(b) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.[49]

Customer lists constitute trade secrets "where the customers are not known in the trade or are discoverable only by extraordinary efforts."[50]  However, "where the customers are readily ascertainable outside the [owner's] business as prospective users or consumers of the [owner's] services or products, trade secret protection will not attach."[51]

Additionally, even where customer lists would otherwise constitute trade secrets, the owner must make reasonable efforts to maintain their secrecy.[52]  For example, in *Medspring Group, Inc. v. Feng*,[53] the court denied a motion for preliminary injunction in part because Plaintiff disclosed alleged trade secret information to an unrelated third-party who was not subject to a non-disclosure agreement.[54]  However, the presence of an express confidentiality or non-disclosure agreement is not necessarily required for a trade secret owner's efforts to be "reasonable under the circumstances."[55]  In fact, Utah courts expressly allow a trade secret

---

[49]Utah Code Ann. § 13-24-2(4)(a)-(b).

[50]*Microbiological Research Corp. v. Muna*, 625 P.2d 690, 700 (Utah 1981) (quoting *Leo Silfen, Inc. v. Cream*, 278 N.E.2d 636, 639-41 (N.Y. 1972)).

[51]*Id.* (quoting *Leo Silfen*, 278 N.E.2d at 639-41).

[52]Utah Code Ann. § 13-24-2(4)(b).

[53]*Medspring Group, Inc. v. Feng*, 368 F. Supp. 2d 1270 (D. Utah 2005).

[54]*Id.* at 1278.

[55]*See* Utah Code Ann. § 13-24-2(4)(b); *Marshall v. Gipson Steel, Inc.*, 806 So. 2d 266, 272 (Miss. 2002) (holding that Mississippi Uniform Trade Secrets Act, which contains nearly identical language to the UTSA, does not require a non-disclosure agreement "per se" in order to satisfy the reasonable secrecy efforts requirement); *Southwest Why, Inc. v. Nutrition 101, Inc.*, 117 F. Supp. 2d 770, 779 (C.D. Ill. 2000) ("[A] restrictive covenant or confidentiality agreement is not a prerequisite to recovery under the [Illinois Trade Secrets Act].").

misappropriation action to proceed where the secret was conveyed to the defendant under an "implied agreement limiting disclosure."[56]

The Court finds that there is an issue of material fact regarding whether Plaintiff's customer list constitutes a trade secret. According to Mr. Shott, Plaintiff's President, Plaintiff compiled its customer list over some ten years at great expense to the company and has taken the following steps to maintain its secrecy: (1) assigning a password to the electronic file containing the list, (2) allowing only a few employees in the sales department to access it, and (3) requiring key employees to sign confidentiality agreements.[57] Mr. Shott further indicates that he disclosed a portion of Plaintiff's customer list to Mr. Holbrook, Plaintiff's sales representative for the Rocky Mountain region, pursuant to a relationship of trust with Mr. Holbrook.[58] According to Plaintiff, Mr. Holbrook was acting as Plaintiff's agent at the time and, therefore, had a fiduciary duty to not disclose or otherwise use the customer list to injure Plaintiff. While Defendants have produced evidence that Plaintiff's list was disclosed to Mr. Holbrook in the absence of any express indication of a duty to maintain the list's confidentiality, a jury could reasonably conclude that an agency relationship existed and that Plaintiff actions in disclosing the customer list to Mr. Holbrook were, therefore, reasonably calculated to maintain the list's secrecy.

Defendants offer evidence that at least part of Plaintiff's list is comprised of contacts given to it by Mr. Holbrook. However, there is no evidence as to how many of the contacts were attributable to Mr. Holbrook. In the absence of this information, the fact that Mr. Holbrook

---

[56]*Water & Energy Sys. Tech. v. Keil*, 974 P.2d 821, 822 (Utah 1999).

[57]Docket No. 147 Ex. 7, at ¶¶ 31-33.

[58]*Id.* at ¶ 36.

provided some customer information that may have been included in Plaintiff's list does not entitle Defendants to judgment as a matter of law that Plaintiff's list is not a trade secret or that Plaintiff is not the rightful owner of the list.

Additionally, Defendants offer lay opinion testimony that industry practice was for manufacturers to disclose their customer lists to independent sales representatives like Mr. Holbrook without any duty of confidentiality in order to allow the sales representatives to freely market the manufacturers' products. Plaintiff offers no evidence concerning industry practice. Nonetheless, a jury could reasonably decide to reject Defendants' industry practice evidence in favor of Plaintiff's agency theory, concluding that Plaintiff's relationship with Mr. Holbrook did not conform to industry practices. To decide otherwise would require the Court to weigh facts and determine issues of credibility, which it cannot do at the summary judgment stage.

### 2. Misappropriation

Defendants claim that they are entitled to summary judgment on Plaintiff's trade secret misappropriation claim because Plaintiff has offered no evidence that Defendants used Plaintiff's customer list. Plaintiff argues that there is sufficient evidence of access and similarity to preclude summary judgment.

The UTSA defines trade secret misappropriation as follows:

(a) acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or

(b) disclosure or use of a trade secret of another without express or implied consent by a person who:

. . . .

(ii) at the time of disclosure or use, knew or had reason to know that his knowledge of the trade secret was:

20

(A) derived from or through a person who had utilized improper means to acquire it;

(B) acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use; or

(C) derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use.[59]

In the absence of direct evidence, courts generally allow use of circumstantial evidence to prove misappropriation of trade secrets because "requiring direct evidence would foreclose most trade-secret claims from reaching the jury [as] corporations rarely keep direct evidence of their use ready for another party to discover."[60]  Thus, a plaintiff may prove use of its trade secrets by showing (1) access by the defendant to the trade secret and (2) similarity in the respective designs or products of the defendant and the trade secret owner.[61]  For example, in *Leggett & Platt v. Hickory Springs Manufacturing Co.*,[62] the Federal Circuit reversed the lower court's grant of summary judgment on a trade secret misappropriation claim under the Illinois Trade Secrets Act for not considering access and similarity evidence.[63]  In that case, the access and similarity evidence consisted of the defendant's hiring of the plaintiff's former employee as a consultant and expert testimony regarding the technical similarity of the parties' products.[64]

---

[59]Utah Code Ann. § 13-24-2(2)(a), (b).

[60]*See Stratienko v. Cordis Corp.*, 429 F.3d 592, 600-01 (6th Cir. 2005) (collecting cases from the Second, Third, Fourth, Seventh, Eighth, and Ninth Circuits standing for the proposition that circumstantial evidence may be used to prove misappropriation).

[61]*Id.* at 600.

[62]*Leggett & Platt, Inc. v. Hickory Springs Mfg. Co.*, 285 F.3d 1353 (Fed. Cir. 2002).

[63]*Id.* at 1361-62.

[64]*Id.* at 1361.

Although not specifically addressing the access and similarity method of proof, the Supreme Court of Utah implicitly recognized the possibility of using circumstantial evidence to prove misappropriation in the case of *Water & Energy Systems Technology v. Keil*.[65]  In *Keil*, an employer sued its former employee for trade secret misappropriation, alleging that the employee, who had "access to the [plaintiff employer's] formulae and prices," was using the employer's alleged trade secrets in his new job.[66]  The court analyzed whether the employer was entitled to a preliminary injunction based on the similarity of the new employer's formulae and prices to the plaintiff employer's formulae and prices, ultimately concluding that not enough evidence of similarity was present to justify the issuance of a preliminary injunction.[67]

The Court finds that there remains an issue of material fact as to whether Defendants misappropriated Plaintiff's customer list.  According to Mr. Shott, shortly after Mr. Holbrook received Plaintiff's customer list, he terminated his relationship and began to represent Defendants.[68]  Additionally, Plaintiff argues that some 27% of the customers on Defendants' current customer list are found on the customer list provided by Plaintiff to Mr. Holbrook.[69] From this, Plaintiff argues that a reasonable jury could infer that Mr. Holbrook disclosed Plaintiff's list to Defendants and that Defendants used that list in building their own customer list.  The Court agrees that there is sufficient evidence of access and similarity for the issue of whether Defendants used Plaintiff's customer list to be decided by a jury.

---

[65]974 P.2d 821 (Utah 1999).

[66]*Id.* at 821-22.

[67]*Id.* at 823.

[68]Docket No. 147 Ex. 7, at ¶ 40.

[69]*See* Docket No. 174, at Exs. NN and OO.

22

Defendants also argue that Plaintiff has produced no evidence that Defendants knew or should have known that Mr. Holbrook owed a duty to Plaintiff to maintain the secrecy of Plaintiff's customer list and to limit its use.  However, in light of the proffered evidence that Mr. Holbrook terminated his relationship with Plaintiff and began representing Defendants shortly after receiving Plaintiff's customer list, a jury could reasonably conclude that Defendants knew or should have known that Mr. Holbrook owed a duty to Plaintiff to maintain the secrecy of the list by virtue of his recent representation of Plaintiff.

Consequently, as issues of fact remain regarding whether Plaintiff's customer list constitutes a trade secret protectable under the UTSA and whether Defendants misappropriated that list, the Court will deny the Trade Secret Motion.

D.  Plaintiff's Motions to Strike

In connection with the briefing on Defendants' summary judgment motions, Plaintiff filed a number of motions to strike: (1) Motion to Strike Declaration of Rick Vincent; (2) Motion to Strike Declaration of Phil Corallo; (3) Motion to Strike Declaration of Michalene E. Winkelspecht; (4) Motion to Strike Declaration of Charles Hart; and (5) Motion to Strike Declaration of Dan Parrish.

None of the Declarations that are the subject of Plaintiff's Motions to Strike affects the Court's disposition of either the Unfair Competition Motion or the Trade Secret Motion. Accordingly, the Court will deny each of Plaintiff's Motions to Strike.

IV.  CONCLUSION

For the reasons set forth above, it is hereby

ORDERED that the Unfair Competition Motion [Docket No. 102] is GRANTED.  It is further

23

ORDERED that the Trade Secret Motion [Docket No. 100] is DENIED.  It is further

ORDERED that the Trademark Motion [Docket No. 104] is DENIED AS MOOT.  It is further

ORDERED that Plaintiff's Motions to Strike [Docket Nos. 118, 135, 137, 139, and 141] are DENIED.

DATED May 8, 2008.

BY THE COURT:

_____
TED STEWART
United States District Judge